**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DANIEL J. GLAUBER,<br>Defendant. | Criminal No.: 1:16-cr-00077-RJL |

**SENTENCING MEMORANDUM OF**
**DEFENDANT DANIEL J. GLAUBER**

Daniel Glauber will appear before the Court for sentencing on February 17, 2017, having pled guilty to a one count information for making a false statement, in violation of 18 U.S.C. § 1001. Counsel for Mr. Glauber submits this memorandum in support of a sentence of (a) three years of probation; (b) restitution in the amount of $70,646.25, consistent with the parties' plea agreement; and (c) no fine, given his inability to pay a fine and the restitution he will make. This sentence, which the Government does not oppose, is "sufficient, but not greater than necessary," to achieve the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2). 18 U.S.C. § 3553(a).

**SUMMARY**

Mr. Glauber is a 44 year-old non-violent, first-time offender. As the Presentence Report ("PSR") and the letters submitted on his behalf demonstrate, *see* **Exs. 2 - 14**, he is devoted to and supports his family, which includes not only his wife and the two children they have had together, but three children he has formally or effectively adopted. He also has dedicated himself to hard work and career, which has included earning a PhD while employed full-time and serving our military and intelligence communities for more than a decade with his expertise in information technology. Mr. Glauber's history as a devoted husband, loving father and responsible member of the workforce establishes that his offense resulted from an uncharacteristic lapse in judgment—

a lapse in judgment for which he has taken full responsibility. He cooperated from the outset with the Government's episodic investigation, which weighed on him for nearly four years, and entered a pre-indictment guilty plea acknowledging what he did. *See* **Ex. 1** (statement of Mr. Glauber).

Importantly, the Government has agreed not to oppose a sentence of probation, which is an indication of its belief that, coupled with restitution, probation is justified under 18 U.S.C. § 3553(a). This belief is undoubtedly correct, as imposing a sentence greater than probation would not only disregard Mr. Glauber's personal history and characteristics, but substantially overstate the seriousness of the offense, in contravention of 18 U.S.C. § 3553(a)(1), (2) & (6). The Government resolves the overwhelming majority of similar time-and-attendance cases through *administrative or civil* enforcement, not criminal prosecution, and even in the rare time-and-attendance case it prosecutes criminally, the typical sentence is probation and restitution, including in cases involving more venal conduct and greater loss amounts than in this case. Moreover, although Mr. Glauber admittedly engaged in wrongful conduct, he completed his assigned work competently and on time; one supervisor referred to him as her "go to." That makes his case different, and less serious, than the ordinary time-and-attendance case. A sentence of probation thus achieves retributive justice: it properly reflects the nature of the offense, promotes respect for the law, and provides just punishment. 18 U.S.C. § 3553(a)(2). This is especially so since Mr. Glauber already has experienced substantial non-judicial punishment. In the midst of building a successful career as a military and intelligence community contractor, Mr. Glauber has now been stigmatized as a convicted felon, which has required him to alter his career path, circumscribed his job opportunities, and deprived him of certain rights and privileges.

A sentence of probation also achieves the goals of both specific and general deterrence. Mr. Glauber will not recidivate, and a sentence of probation will not make him any more likely to

recidivate than a sentence of confinement in any event. Further, social science shows that would-be offenders like Mr. Glauber are deterred no more by confinement than by probation.

The advisory, non-binding recommended sentence of 6 – 12 months imprisonment under USSG § 2B1.1 does not alter the conclusion that a sentence of probation and restitution is appropriate. *First*, and most importantly, the Guidelines range does not adequately account for the other Section 3553(a) factors. *Second*, as numerous courts and commentators have observed, USSG § 2B1.1 prescribes sentences that are unduly harsh because it relies so heavily on loss amount, and it is not entitled to judicial deference because the Sentencing Commission did not devise it in the manner required to give it a presumption of validity. *Third*, and in any event, Mr. Glauber's Total Offense Level, 10, places him in Zone B of the Guidelines, which authorizes the Court to impose a non-prison sentence, including probation.

## ARGUMENT

### I. A Sentence of Three Years of Probation Is Warranted Under 18 U.S.C. § 3553(a).

A district court "shall impose a sentence sufficient, but not greater than necessary . . . :

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In determining whether a sentence is sufficient but not greater than necessary to satisfy these objectives, the Court also must consider: the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the Sentencing Guidelines and policy statements,

§ 3553(a)(4)&(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution, § 3553(a)(7). The Supreme Court has repeatedly made clear that the advisory Guidelines range is but one consideration—"a starting point and an initial benchmark"—and that the Court must weigh all Section 3553(a) factors to make "an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50-52 (2007); *Pepper v. United States*, 562 U.S. 476 (2011).

In Mr. Glauber's case, based on all of the Section 3553(a) factors, a sentence of three years of probation and $70,646.25 in restitution is warranted.

### A. Mr. Glauber's Personal History and Characteristics and the Nature and Circumstances of the Offense Justify the Requested Sentence (18 U.S.C. 3553(a)(1))

#### 1. *Mr. Glauber's Personal History and Characteristics*

Mr. Glauber has led an exemplary life devoted to family and career. He and his wife, Angie, have a "beautiful blended family"—blended because, as Angie and others explain, Mr. Glauber is a father not only to Annabelle (6) and Eli (4), the two young children Angie and he have had together, but to three other children as well. **Ex. 2** (Angie Glauber letter); **Ex. 3** (Juliet Glauber letter); **Ex. 4** (Anderla letter); **Ex. 5** (Steve Glauber letter). Married at a young age, Mr. Glauber adopted his first wife's girl, Holly, and even after he and his first wife separated and divorced, he remained Holly's doting father. *Id.* He supported Holly, now 25, through college; they remain close. *Id.* When Mr. Glauber met and married Angie after divorcing Holly's mother, he similarly took in Angie's children from prior relationships, Karina (19) and Isaac (15), and has treated and loved them as his own. *Id.* This has been "especially meaningful" for Karina and Isaac "because their birth fathers have been absent for years, do not spend time with them … and have never supported them financially." **Ex. 2**. For nearly a decade—throughout their formative

years—Mr. Glauber has been the only father Karina and Isaac have known. *Id.* As Angie explains, he has made a substantial difference in their lives. *Id.*

Mr. Glauber and Angie have a co-equal co-parenting relationship, especially since Angie went back to work over two years ago. **Ex. 2; Ex. 7** (George Glauber letter); **Ex. 11** (V. Davidson letter). While working full-time, Mr. Glauber spends considerable time with all of his children and "shares a special bond with each one." **Ex. 2**. Angie explains, "Ever since I have gone back to work, the kids and I depend more than ever on Dan to be present. Dan and I are a team and I have no idea what will happen if he isn't around for us. As a mother, I have to protect my children and my children cannot live without their father." *Id.*

As with his family, Mr. Glauber has not taken the easy, comfortable path in his career. The adopted son of a hardware store owner who was a refugee from Nazi Europe, he worked through college and earned a B.F.A. in design. Although he began his career as graphic artist, the events of September 11 inspired him to change course. As his mother recounts, "he went to Washington to see what he could do to help." **Ex. 5**. Building on the technical skills he had acquired as a designer, he became an information technology and knowledge management specialist. Over the course of more than a decade, he obtained a security clearance and worked on a series of government contracts in both the local metropolitan region and Florida to support our military and intelligence communities. With his wife's support, despite the temporary hardships for his family, he went to Afghanistan twice for more than six months each, once in 2011-12 and again in 2013-14, to protect our national security. "Although it was a very tough decision to leave the comforts we enjoy here in our country he never questioned what he felt he needed to do." **Ex. 4** (Anderla letter); *see also* **Exs. 2, 3 & 5**.

After his first stint in Afghanistan, his supervisor, Col. Bradley MacPherson-USMC, wrote an "unsolicited recommendation" lauding Mr. Glauber's "impressive reputation for being forthright with thorough knowledge and experience of Information Technology (IT) and Knowledge Management (KM) principles and practices . . . Without his leadership, [our] Division would not have been as successful and known for actively contributing to the mission." **Ex. 8** (Col. MacPherson letter). Fellow contractor Matthew Sullivan, who worked with Mr. Glauber in both Florida and Afghanistan, similarly states that Mr. Glauber is "honest, diligent, and proud of the outstanding work he does for the country . . . [Despite] working twelve hours a day and seven days a week without many breaks … mixed with the stress of rocket attacks and being away from the family Dan loves[,] Dan did all he could to further the mission during the year he was in Kabul. Dan took every chance he could to get to help soldiers do their job just a little more efficiently using expertise he was not required to leverage." **Ex. 9** (Sullivan letter).

Although the investigation that led to this prosecution stripped him of his security clearance, forced him to give up working as a defense and intelligence contractor, and required him to move his family away from the East Coast, Mr. Glauber secured and adapted to a new job in Texas using his IT and knowledge management skills. He has been consistently employed in that job for the past two and a half years. As his co-workers Jamie Price, Dave Davidson, Velina Davidson, and Kelly Hinna attest, he has a strong work ethic, is reliable and trustworthy, and commands respect as a workforce leader. *See* **Exs. 10** (Price letter), **11** (D. Davidson letter), **12** (V. Davidson letter), and **13** (Hinna letter).

On top of family and work, there is also Mr. Glauber's commitment to education. While raising his family and holding down full-time jobs, Mr. Glauber has studied on-line to earn both a

master's degree in business administration and a doctorate in management and organizational leadership.

On its face, the offense of conviction might suggest that Mr. Glauber is a "slacker" who shirks responsibility. Mr. Glauber's family life and work and education history show that nothing could be further from the truth. As every letter writer affirms, the offense Mr. Glauber pled guilty to is utterly inconsistent with who Mr. Glauber is. *See* **Exs. 2-14**. Mr. Glauber's cousin, Juliet, sums it up best: "[T]he day Dan told me he was in legal trouble may be the only time he's ever surprised me . . . Because he has always cared greatly about following the rules and doing the right thing, even – and especially – when it's not the easy thing . . . I know he's never been out to take a shortcut in his life." **Ex. 3**.

**2. *The Nature and Seriousness of the Offense***

**a. The Mine Run of Time-and-Attendance Cases**

An important measure of the seriousness of a defendant's conduct is how the Government has addressed similar conduct in other matters.[1] Tellingly, the Government addresses the overwhelming majority of time-and-attendance cases similar to Mr. Glauber's through administrative or, less frequently, civil enforcement—***not*** criminal prosecution. Its decision to prosecute Mr. Glauber is an outlier.

While not all information regarding time-and-attendance matters recently investigated by agency Inspectors General is readily publicly available, a certain amount is. The key conclusion to be drawn from this information is that U.S. Attorney's Offices, including local U.S. Attorney's

---

[1] Although 18 U.S.C. § 3553(a)(6) takes into consideration how *courts* have sentenced defendants in similar *criminal* cases, *see infra*, it does not, by its plain terms, take into consideration how *the Government* typically views similar conduct in other matters. But 18 U.S.C. § 3553(a)(1)'s command to evaluate the nature of the offense requires courts to do so, as does 18 U.S.C. § 3553(a)(2)'s command to evaluate "the seriousness of the offense."

Offices, generally return time and attendance matters to the referring agencies for administrative action and decline prosecution. This holds true for matters in which the total alleged loss matches or exceeds the loss the Government has alleged in Mr. Glauber's case.

In 2014, the Department of Defense Inspector General issued an audit report summarizing the results of 131 "significant," closed contract employee misconduct investigations spanning ten (10) years at four different agencies, including the National Security Agency ("NSA"), one of the agencies involved in this matter. *See* *http://www.dodig.mil/pubs/documents/DODIG-2014-060.pdf* ("DOD IG Report"). A substantial majority of the misconduct investigations—89 out of 131—involved alleged time-and-attendance misconduct by individuals or groups of contract employees. *Id.* at 33. Of 86 cases involving individual employees, the median loss amount for the Government was $32,443.88, the average loss amount was $41,788.96, and the highest loss amount was $265,698. *Id.* As the audit report makes clear, ***none*** of the subject contract employees faced administrative sanctions, much less criminal prosecution: "The misconduct documented in the IG investigations we reviewed did not result in suspension or debarment, or generally in prosecution." *Id.* at 28. Moreover, after the investigations closed, many of the subjects—including those who worked at NSA—did not have their security clearances revoked. *Id.* at 28, 34. The auditors concluded, "In most instances, the[] losses were fully recouped from the contractors' employers. Therefore, ***a widespread belief existed*** among the personnel security staff and ***at the Department of Justice that recouping the losses made the government 'whole' again, thereby reducing the need for further action***." *Id.* at 33 (emphasis added).

A review of alleged time-and-attendance misreporting in numerous local matters for which information is publicly available likewise shows that criminal prosecution did not result and that administrative action was sufficient to satisfy the Government's interests:

- In 2012, the Department of Housing and Urban Development Inspector General concluded that a program analyst had spent two to three hours a day for six years, from 2005 to 2011, working on outside business ventures, which included soliciting funds from landlords for referring potential tenants, coaching a basketball team and "providing women as entertainment for a private party."[2] The case, reported in the media, resulted in temporary suspension; the employee continued to work at the agency as of 2014. The specific loss amount is unclear, but based on media reporting and available federal salary data, the employee's FY 2014 salary was $98,916. Using an eight-hour work day and two hours per day spent on non-work activities, a conservative estimate of the loss amount exceeds $125,000. The U.S. Attorney for the District of Columbia declined prosecution.

- When confronted with records covering a two-and-a-half year span in which the National Reconnaissance Office ("NRO") Inspector General found $44,094 in unearned compensation, a contractor employee at the NRO acknowledged intentionally submitting hours she did not work not only during that period, but for an additional two-and-a-half years before. Thus, the loss amount was actually higher than $44,094. The U.S. Attorney for the Eastern District of Virginia declined prosecution.[3]

- An NRO contractor or employee acknowledged intentionally submitting hours she did not work over a five-year span, including but not limited to 803.75 hours she did not work between September 2008 and February 2011. The NRO said the earlier records were unavailable. The U.S. Attorney for the Eastern District of Virginia declined prosecution.[4]

- From September 2008 to February 2011, an NRO employee at the Aerospace Data Facility East recorded 954.5 that she did not work. Badge records were unavailable prior to September 2008, but the employee admitted intentionally submitting hours she did not work for five years. The U.S. Attorney for the Eastern District of Virginia declined prosecution.[5]

- For approximately 15 years starting in 1996, a contract employee at NRO admitted intentionally submitting hours he did not work, including 508.5 hours he should not have been paid for from September 2008 to April 2011. Earlier records were not available. The U.S. Attorney for the Eastern District of Virginia declined prosecution.[6]

- From September 2008 to April 2011, an NRO employee or contractor recorded 326 hours that he did not work. Badge records were unavailable prior to September 2008, but the individual admitted intentionally submitting hours he did not work dating back to 2005. The U.S. Attorney for the Eastern District of Virginia declined prosecution.[7]

---

[2] HUD IG Report of Investigation, Program Analyst GS-13, issued August 15, 2012. *See also* Washington Times, *Federal Workers Hold onto Jobs despite Misconduct*, May 14, 2014.
[3] NRO Inspector General Case No. 2011-068, accessed via governmentattic.org.
[4] NRO Inspector General Case No. 2011-069, accessed via governmentattic.org.
[5] NRO Inspector General Case No. 2011-066, accessed via governmentattic.org.
[6] NRO Inspector General Case No. 2011-099, accessed via governmentattic.org.
[7] NRO Inspector General Case No. 2011-103, accessed via governmentattic.org.

- From May 2010 through April 2011, an NRO employee or contractor recorded 167.5 hours that she did not work. Badge records prior to May 2010 were not examined, but the individual admitted intentionally submitting hours she did not work dating all the way back to 1995. The U.S. Attorney for the Eastern District of Virginia declined prosecution.[8]

- A manager at the General Services Administration spent considerable time on book writing projects at work. The U.S. Attorney for the District of Columbia declined prosecution.[9]

- In 2013, an investigation by the Federal Communications Commission Inspector General found an employee spent up to eight hours per week looking at pornography from his work computer. There is no indication the case was referred for criminal prosecution.[10]

- Among more than two dozen Securities and Exchange Commission pornography-related time-and-attendance misconduct investigations from 2008 to 2010, none resulted in criminal charges, including in the District of Columba. In one case, a senior attorney was allowed to resign, but faced no criminal prosecution, after a SEC Inspector General review found he spent up to eight hours a day downloading pornography. Another SEC employee, a senior accountant, was denied access to pornography sites by the SEC's filtering device 16,000 times in one month, or 800 times per workday, and received a 14-day suspension.[11] There was no prosecution.

- A deputy assistant for the Bureau of Public Debt was found to have committed time-and-attendance fraud with a total loss to the government of $97,832, according to a Treasury report of investigation dated August 21, 2012. The Public Integrity Section and the responsible U.S. Attorney's Office in West Virginia declined prosecution.[12]

- Brigadier General Richard G. Elliot improperly approved his own time-and-attendance records, receiving approximately $194,370 in pay and benefits, according to a DOD IG report issued June 7, 2012. The responsible U.S. Attorney's Office declined prosecution.[13]

Based on all of this publicly available information, it is apparent that the Justice Department rarely prosecutes time-and-attendance matters, usually deferring to the responsible agency to take appropriate administrative action.

---

[8] NRO Inspector General Case No. 2011-116, accessed via governmentattic.org.
[9] General Services Administration Office of Inspector General Case No. 13H3691.
[10] FCC Office of Inspector General, *FCC Employee, Prohibited Use of Government Computer and Time and Attendance Issues*, October 17, 2013.
[11] *SEC Porn Investigation Nets Dozens*, The Washington Post, April 23, 2010.
[12] Treasury Department Inspector General Case BPD-12-1078.
[13] DOD IG Report No. 11-118752-109.

When the Department of Justice does get involved, it usually intervenes in already-filed, large-scale, *qui tam* civil False Claims Act lawsuits, including in cases involving far more extensive misconduct than in this case. For instance, in 2014, DOJ intervened to require defense contractor MPRI, Inc. to pay $3.2 million to resolve *qui tam* allegations that, for over five years, it billed for work for employees who were actually on leave.[14] In another recent *qui tam* FCA matter in which DOJ intervened, the defendant, Education Holdings/Princeton Review, resolved claims that it falsified time-and-attendance records in a federally-funded program to provide tutoring services.[15] Similarly, in a relatively recent, reported False Claims Act case in this District, *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186 (D.D.C. 2011), DOJ intervened against a company that provided moving and other services to various government agencies where the relator alleged that the company, among other things, billed for employees who signed in but did not actually perform work on the job. *See also United States ex rel. Hinden v. UNC/Lear Servs., Inc.*, 362 F. Supp. 2d 1203, 1206 (D. Haw. 2005) (DOJ intervened and settled claims against government contractor for submitting invoices for services that reflected erroneous time-and-attendance information).

Inasmuch as the Government typically handles time-and-attendance misconduct similar to, and very often more extensive than, Mr. Glauber's through administrative or civil enforcement, rather than criminal prosecution, sentencing Mr. Glauber to something more than probation would substantially overstate the seriousness of his offense, in violation of 18 U.S.C. § 3553(a)(1) & (2).

**b. The Offense Conduct**

Accepting responsibility for his actions, Mr. Glauber explains what happened here, **Ex. 1**:

---

[14] *See* http://www.justice.gov/opa/pr/mpri-inc-agrees-pay-32-million-false-labor-charges-contract-support-army-afghanistan.
[15] *See* http://www.justice.gov/usao/nys/pressreleases/December12/PrincetonReviewSettlement.php.

> When I returned to Maryland in March 2012 after my first stint in Afghanistan, I decided to start my own business in government contracting. Within two months, I secured two subcontracts requiring security clearances, one working at OPM and another working at NSA. Each position generally required me to work full eight hour days on weekdays. At the time, I felt I could take on both jobs even though I knew it would be hard work and long hours. I initially did not believe the long hours would be too difficult to manage based on my work in Afghanistan, where I worked seven days per week and a minimum of 12 hours per day. I took both jobs because I wanted to establish my new company as quickly as possible as an experienced, reliable IT partner for the defense and intelligence communities.
>
> For three months, before I was terminated from the OPM contract in August 2012 due to the investigation that ultimately led to this prosecution, I felt I worked really hard. But I neglected something critically important—my responsibility for accurate, truthful time keeping. To be in proximity to my family on weekdays (if not actually with them) for at least some amount of time, I performed some of my work at home, and when I worked at home, I did not keep track of my hours like I needed to. My shortsighted and improper focus was on my work performance and the work product I provided the two agencies, not my hours. As a result, I submitted time sheets that often showed me working a full eight hours on both jobs on the same day, when I did not actually know that to be true and knew deep down that it almost certainly was not true. Yes, I did my assigned jobs competently, and I did work from home, and no one at OPM or NSA complained to me about the quality or timeliness of my work product. But that could not justify submitting time sheets that I knew I could not stand by.
>
> The crime I committed was the result of poor decision-making and arrogance. I felt that, because I was working hard and getting my work done, I could justify submitting time sheets showing I worked complete days, even if I couldn't say I actually did . . .

As Mr. Glauber acknowledges, his conduct was wrongful—"irresponsible conduct [that] not only goes against everything my parents taught me, but against everything I have worked so hard to establish in my career." *Id.* There are, however, important mitigating facts that make his case different and less serious than cases of inherently venal time-and-attendance misconduct. Mr. Glauber did not turn in "fake" work or otherwise fail to do his assigned work. *See, e.g., United States v. Reaves*, 1:15-cr-00090-RJL (sentencing OPM-Federal Investigative Services contractor, who pled guilty to a Section 1001 violation, to 36 months of probation and $91,124.20 in restitution for billing government for conducting background investigations that he never did). To the contrary, as the case agents have reported based on their own witness interviews, he completed all

of his assigned work competently. No one with OPM, NSA or any of the prime contractors with which Mr. Glauber worked during the offense period ever complained contemporaneously about the quality, quantity, or timeliness of Mr. Glauber's work or gave Mr. Glauber a negative performance evaluation. Rather, as the case agents told Mr. Glauber in their recorded interviews of him, he received positive reviews. One supervisor at NSA described Mr. Glauber as her "go to." And when the contractor on the NSA contract with RTGX had to make budget cuts, it kept Mr. Glauber—only one of two individuals asked to remain after the reduction-in-force.

Moreover, unlike in many cases sentenced under USSG § 2B1.1, Mr. Glauber did not *intend* to provide the government anything less than the work product it expected from him. He began with every intention of working full-time on each contract, including for the three-month period when he was working on both OPM and NSA contracts simultaneously. He had worked equally hard—at least twelve hour shifts, seven days a week—in Afghanistan immediately before he started these contracts, so he believed he could, and he was starting up his own business, so he expected to. **Ex. 1**. Mr. Glauber also did certain work from home, *id.*, as confirmed not only by his wife, *see* **Ex. 2**, but by the fact he never received complaints about the quality, quantity or timeliness of his work. And, as noted, he got his work done. Mr. Glauber's critical lapse in judgment—the lapse for which he has taken full responsibility—was to work from home without authorization, to fail to track his time scrupulously for such work, and to submit timesheets knowing that he could not substantiate the number of hours reflected on them. That is different, and less worthy of a sentence of imprisonment, than the typical USSG 2B1.1 offense, especially given the relatively small loss amount spread out over approximately 15 months of work.[16]

[16] *See* ABA Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes (Nov. 2014), at *http://www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.authcheckdam.pdf* ("ABA CJS November 2014 Task Force Report") (concluding that, as written, Section 2B1.1 does not adequately account for different levels of culpability for economic crimes—including, e.g., the defendant's motive,

**B. The Requested Sentence Is "Available" (18 U.S.C. § 3553(a)(3))**

The requested sentence of three years of probation is available, as 18 U.S.C. § 1001 is a Class D felony. *See* 18 U.S.C. § 3561(c)(1). A sentence that includes no prison term is also consistent with Congress's command that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society." Pub. L. No. 98-473, § 239, 98 Stat. 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

**C. The Advisory, Non-Binding Guidelines Calculation Prescribes an Unwarranted Sentence (18 U.S.C. §§ 3553(a)(4) & (5))**

The Government, the Probation Office, and Mr. Glauber agree that, under USSG § 2B1.1, Mr. Glauber's offense level is 10: Base Offense Level – 6; Loss Amount of more than $40,000 – Add 6; Acceptance or Responsibility – Subtract 2. The prescribed range at Level 10 is 6 – 12 months imprisonment. However, because Level 10 is in Zone B, a probationary sentence remains available. USSG § 5B1.2(a).

In view of all of the other Section 3553(a) factors discussed throughout this memorandum, the USSG § 2B1.1-prescribed sentence of 6 – 12 months imprisonment—indeed, a sentence requiring any kind of confinement—is unwarranted. That Section 2B1.1 produces such an unwarranted sentence should come as no surprise. As other courts and commentators have long observed, Section 2B1.1 routinely overstates the seriousness of an offense because it relies so heavily on loss amount. *See, e.g., United States v. Algahaim*, 2016 NYLJ LEXIS 2950 at *9-11 (2d Cir. Dec. 1, 2016) (by making loss amount "the principal determinant of the adjusted offense level and hence the corresponding sentencing range"—an "approach[] unknown to other

---

the correlation of loss amount and the amount of the defendant's gain, the degree of sophistication, extenuating circumstances, and whether the defendant took steps to mitigate the harm—and recommending specific offense characteristics based on levels of culpability).

sentencing systems"—the Commission devised a scheme whose "unusualness" "*entitles* a sentencing judge to consider a non-Guidelines sentence") (emphasis added); ABA CJS November 2014 Task Force Report; Leah McGrath Goodman, *Nonsensical Sentences for White Collar Criminals*, Newsweek (June 26, 2014).

Moreover, the range Section 2B1.1 prescribes is entitled to no judicial deference. That is because, in crafting and revising Section 2B1.1, the Commission did not do what it was required to do to give Section 2B1.1 a presumption of validity. *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007) (where the Commission has not developed a particular guideline based on "empirical data and national experience," district courts may vary downward from the Guidelines under § 3553(a) because the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case"). That is, the Commission did not rely on past sentencing practices for economic crimes when it initially promulgated Section 2B1.1, and in consistently ratcheting up the prescribed sentences over the years, it did not look to the "national experience" with economic crimes cases, *i.e.*, judicial decisions, further sentencing data and criminological research. *Id.* at 96 (identifying factors entitling Guidelines to presumption of validity); *Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007) (same); Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 23 (1988) (in crafting Section 2B1.1, the Commission "decided to abandon the touchstone of prior past practice" and instead prescribed "significantly more severe sentences"); Carlton Gunn & Myra Sun, *Sometimes the Cure Is Worse Than the Disease*, 30 ABA Human Rights J. (Summer 2011) ("The changes 'always tended to increase the guidelines sentences for economic offenders, and were not prompted by the empirical research that the Supreme Court described in *Kimbrough* . . . . Rather, the Commission started with its conclusions.") (citations omitted). In fact, rather than

following the national experience, the Commission has disregarded it: sentencing courts have signaled widespread disagreement with Section 2B1.1. Perhaps most tellingly, between FY11 and FY15, the rate of within-range sentences for 2B1.1 offenders country-wide decreased from 54.4% to 42.4%, such that the ***majority*** of 2B1.1 sentences country-wide are now below-Guidelines sentences. *See* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY15.pdf.

Because the advisory Section 2B1.1 fails to account for all of Section 3553(a)'s considerations and is otherwise entitled to no deference, the Court should have no compunction about varying downward from the applicable Guidelines range to impose a sentence of probation and restitution, consistent with the parties' plea agreement and the commands of Section 3553(a).

**D. Imposing a Sentence Greater than Probation Would Produce an Unwarranted Sentencing Disparity (18 U.S.C. § 3553(a)(6))**

As explained in Section A.2.a., *supra*, the overwhelming majority of time-and-attendance cases are addressed through administrative enforcement or civil enforcement, not criminal prosecution. But even in the small number of roughly similar cases the Government has chosen to prosecute—cases involving similar or greater loss amounts and similar or more serious conduct—courts have imposed probationary sentences. *See, e.g., United States v. Reaves,* 1:15-cr-00090-RJL (sentencing OPM-Federal Investigative Services contractor, at Offense Level 10, to 36 months of probation and $91,124.20 in restitution for violating Section 1001 by billing government for conducting background investigations that were never done); *United States v. Adams,* 1:14-cr-161-CKK (48 months of probation and $10,000 in restitution for same conduct); *United States v. Utu*, 1:15-cr-00019-BAH (for Offense Level 10, 36 months of probation and $30,763 restitution for violating Section 641 by using, for personal home improvement, over $100,000 in grants awarded to construct housing for low-income renters in American Samoa);

*United States v. Meadows*, 1:14-cr-00073-ABJ (for Offense Level 13, 36 months of probation for violating Section 641 by fraudulently obtaining over $13,000 in unemployment benefits, lying to MPD to permit boyfriend to escape, and lying to Department of Corrections to smuggle contraband to boyfriend); *United States v. Isaacs*, 1:14-cr-00242-RMC (for Offense Level 13, 24 months of probation for violating Section 641 by submitting false vouchers totaling over $60,000 for travel reimbursements to Treasury Department).

Statistics the Sentencing Commission compiles every year confirm the trends that the results in these recent cases suggest. In the District of Columbia in FY15, 29% of all Section 2B1.1 fraud/larceny/embezzlement cases were resolved with a probation-only sentence and 52% with either probation-only or a combination of probation and confinement short of incarceration, *see* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2015/stats_DC.pdf; and fully 67% of *all* cases—over two-thirds—were resolved with a below-Guidelines sentence. *See id.*; http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2015/TableN-DC.pdf. In addition, as mentioned above, between FY11 and FY15, the rate of within range sentences for 2B1.1 offenders *country-wide* decreased from 54.4% to 42.4%, meaning that the majority of 2B1.1 sentences *country-wide* are now below-Guidelines. *See* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY15.pdf.

Sentencing Mr. Glauber to probation would not create an unwarranted disparity under Section 3553(a)(6). Just the opposite is true: a prison sentence *would* create such a disparity.

**E. The Requested Sentence Would Facilitate Restitution (18 U.S.C. § 3553(a)(7))**

The restitution amount in this case is $70,646.25, a substantial sum given Mr. Glauber's present financial condition. Mr. Glauber will not be capable of satisfying this obligation in prison.

He will only be able to begin to make payments, and to continuing making them, by maintaining gainful employment. Therefore, a probationary sentence is also justified under 18 U.S.C. § 3553(a)(7). *See, e.g.*, *United States v. Edwards*, 595 F.3d 1004, 1011, 1016 (9th Cir. 2010) ("'The term of probation imposed will enable [defendant] to continue working in order to pay the significant amount of restitution he ow[e]s'"); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging court's discretion to impose probationary sentence since the "goal of obtaining restitution for the victims . . . is better served by a non-incarcerated and employed defendant"); *United States v. Coleman*, 370 F. Supp. 2d 661, 681 (S.D. Ohio 2005) ("five years of probation, as opposed to one year of imprisonment or imprisonment with supervised release, will afford Defendants more time to pay restitution"), *aff'd in part and vac'd in part sub nom United States v. Kaminski*, 501 F.3d 655 (6th Cir. 2007); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting variance so that defendant could work and pay restitution).

**F. The Requested Sentence Is Sufficient, But Not Greater Than Necessary, To Satisfy The Purposes Of Punishment (18 U.S.C. § 3553(a)(2))**

**1. *Seriousness Of Offense, Respect For Law, Just Punishment***

The requested sentence achieves retributive justice. For a number of reasons, it reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. Mr. Glauber is a nonviolent, first-time offender with an admirable history of devotion to family and hard work. *See* Section A.1.a., *supra*. The seriousness of his offense is mitigated by the fact that he completed his assignments competently and punctually and that the Government typically punishes similar conduct by obtaining restitution through administrative channels. *See* Section A.2., *supra*. Mr. Glauber has pled guilty and fully accepted responsibility for his conduct and expressed genuine remorse. *See* **Ex. 1**. Since his guilty plea, and in the months leading up to it, Mr. Glauber has demonstrated his respect for the law by complying with the terms of his release.

Finally, Mr. Glauber has already suffered significant non-judicial punishment. He has had to endure an investigation and prosecution lasting well over four years, which has proven enormously stressful. He was terminated from the lucrative job he had as a contractor; lost his security clearance; had to abandon the line of work he had chosen and pursued for twelve years in the military and intelligence communities; was out of work for several months; had to move his family to an entirely new city in Texas, far away from other relatives and friends, for a new, less lucrative job; has had to go deeper into debt because he is unable to earn as much as he did before; and must now live with the stigma of being a convicted felon, which will constrain both his career opportunities and his civil rights and privileges.

At this point, the best way to achieve genuine retributive justice is to require Mr. Glauber to remediate the specific harm he caused. That objective, which is fundamental to the concept of retribution, is best achieved by sentencing Mr. Glauber to probation and requiring him to pay restitution—which he will not be able to begin to pay if he is in prison.

**2. *Deterrence***

The requested sentence of probation and restitution serves the purpose of specific deterrence: Mr. Glauber will not recidivate. His restitution obligation will be a constant reminder of the severe consequences of his actions, and the immeasurable adverse impact his actions already have had on him and his family will deter him from engaging in any such actions in the future. A prison sentence is not necessary to deter Mr. Glauber. *See United States v. Luna-Jasso*, No. CR 14-3523, 2015 U.S. Dist. LEXIS 28551, *48-49 (D.N.M. Feb. 19, 2015) (explaining that the "weight of the research indicates that incarceration—imposing it at all or increasing the amount imposed—either has no significant correlation to recidivism or *increases* the defendant's likelihood to recidivate," even for white collar criminals); *Measuring Recidivism: The Criminal*

*History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Commission (2004), at 10-14 & Exs. 10-12 (very low recidivism rates found for offenders who have no criminal history points, had stable employment in the year prior to arrest, are married, have attained higher education, have no history of illicit drug use, and are sentenced under the theft/fraud guideline).

Further, a sentence of probation and restitution will achieve the goal of general deterrence. Particularly for economic crimes, it is the certainty of punishment, rather than the severity of punishment, that deters. A sentence of probation is therefore enough to prevent others from committing offenses similar to the one here. *See, e.g.*, National Research Council, Comm. on Causes and Consequences of High Rates of Incarceration, Comm. on Law and Justice, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 90 (2014) ("Three National Research Council studies have examined the literature on deterrence and concluded that insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects. Nearly every leading survey of the deterrence literature in the past three decades has reached the same conclusion." (citations omitted)); Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* (Nov. 2010) ("'[T]he studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.'") (citation omitted); *Luna-Jasso*, 2015 U.S. Dist. LEXIS 28551, at *47-49 ("The weight of the research indicates that incarceration—imposing it at all or increasing the amount imposed—either has no significant correlation to recidivism or *increases* the defendant's likelihood to recidivate," including for white-collar criminals); U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014) ("Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime.").

**3. *Incapacitation***

A non-violent, first-time offender, Mr. Glauber poses no danger to society requiring his incapacitation. He is a devoted husband and father and a respected co-worker who is making valuable contributions to society, and he will not recidivate. *See* **Exs. 2-14**.

**4. *Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment***

Mr. Glauber's sentence need not require educational or vocational training, medical care, or other correctional treatment, as the PSR confirms.

## II. Consistent With The Plea Agreement, The Amount of Restitution Should Be $70,646.25

The parties have agreed to a restitution amount of $70,646.25. That is the appropriate amount. And because Mr. Glauber pled guilty to an Information that (i) charged him with causing loss in that precise amount and (ii) alleged an offense, 18 U.S.C. § 1001, that does not "involve as an *element* a scheme, conspiracy, or pattern of criminal activity," 18 U.S.C. § 3663A(a)(2), the Court may not impose anything more. *See, e.g.*, Memorandum Opinion, *United States v. Thomas*, 1:12-cr-00003-JDB (D.D.C.), ECF. No. 29 (May 31, 2012) (collecting cases).

## III. No Fine Should Be Imposed.

As the PSR establishes, Mr. Glauber does not have the ability to pay a fine in addition to making restitution. Based on the facts the Court must consider under 18 U.S.C. § 3572(a)—including Mr. Glauber's lack of financial resources, his family's total monthly income, his net worth, his family's dependence on his earnings, and his need to pay restitution—no fine should be imposed.

## CONCLUSION

Based on all of the Section 3553(a) factors, Mr. Glauber respectfully requests that the Court impose a sentence of (a) three years of probation; (b) restitution in the amount of $70,646.25; and (c) no fine.

Respectfully submitted,

/s/ Seth Rosenthal

Seth A. Rosenthal (Bar No. 482586)
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004
Tel: 202-344-4741
Facsimile: 202-344-8300
sarosenthal@venable.com

*Counsel for Defendant Daniel Glauber*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 10, 2017, I caused a true and correct copy of the foregoing SENTENCING MEMORANDUM OF DANIEL J. GLAUBER to be filed electronically with the Clerk of the Court on the ECF system. The document is available for reviewing and downloading on the ECF system.

/s/ Seth Rosenthal
Seth Rosenthal